w

*1064855753*

STATE OF OKLAHOMA
Comanche County
FILED in the
Office of the Court Clerk

MAR 06 2026

By bH
Deputy

**IN THE DISTRICT COURT IN AND FOR COMANCHE COUNTY**
**STATE OF OKLAHOMA**

1. KATHRYN L. SPECHT, as Surviving Next of Kin to TAYLOR KEITH SPECHT, deceased,

Plaintiff,

v.

1. THE COMANCHE COUNTY FACILITIES AUTHORITY, and
2. WILLIAM HOBBS

Defendants,

Case No: CJ-2026-158

ATTORNEY LIEN CLAIMED

JWalker

## PETITION

COMES NOW the Plaintiff, Kathryn L. Specht ("Plaintiff"), as Surviving Next of Kin to Taylor Keith Specht, deceased, by and through her attorneys of record, and for her causes of action against the Defendants, alleges and states as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff, Kathryn L. Specht, is a citizen of Oklahoma and is the surviving natural mother of Taylor Keith Specht ("Taylor"), who passed away on March 6, 2024, while incarcerated at the Comanche County Detention Center ("CCDC") in Lawton, Oklahoma. The causes of action in this matter are based on violations of Taylor's rights under the Fourteenth and/or Eighth Amendments of the United States Constitution.

2. Defendant Comanche County Facilities Authority ("CCFA") is an Oklahoma public trust, created and managed by the Board of County Commissioners for Comanche County, Oklahoma ("BOCC"). The CCFA operates, manages, and controls the CCDC, and is responsible for the custody, care, and safety of inmates housed at the CCDC.



Exhibit 2

3. Defendant William Hobbs ("Weber") was the Administrator of the CCDC at the time of the events giving rise to this lawsuit, residing in Comanche County, Oklahoma, acting under the color of state law. As Administrator, Hobbs was the final policymaker at the CCDC, with operational authority and supervisory responsibility over CCDC personnel, and was further responsible for creating, adopting, and enacting policies, practices, and procedures to protect inmate health and safety. Defendant Hobbs is sued in his individual capacity, based on his supervisory role at the CCDC.

4. The events and occurrences that give rise to this action stem from a series of events that occurred in Comanche County, Oklahoma

5. This Court has jurisdiction, and venue is proper in Comanche County, Oklahoma.

**FACTUAL ALLEGATIONS**

6. Paragraphs 1 through 5 are incorporated herein by reference.

- ***Taylor's History and March 6, 2024 Death***

7. Taylor, who was born in Duncan, Oklahoma, on November 10, 1979, enlisted in the United States Navy in or around 1998 shortly after graduating from high school.

8. When Taylor left the Navy years later, he began struggling with his mental health and was later diagnosed with several mental illnesses.[1]

9. As Taylor struggled to regulate his diagnosis, his mental health began to decline, and his behavior grew increasingly erratic.

10. Taylor's entry into the criminal justice system began in kind in February 2016, when Taylor, who had no prior criminal record at that point, was arrested for indecent exposure.

---

1 In particular, Taylor was diagnosed with PTSD, bipolar, disassociated disorder, and schizophrenia. These diagnoses caused a significant disruption in Taylor's everyday life.



**Exhibit 2**

*See State v. Specht*, Comanche County Case No. CF-2016-112. Taylor was sentenced to Mental Health Court on that charge in March 2016, which he successfully completed in May 2017.

11. In February of 2021, Taylor was hospitalized at the Jim Taliaferro Community Mental Health Center ("Taliaferro Health Center") for approximately one (1) week due to his being "suicidal."

12. In December 2021, Taylor was arrested again for an alleged assault and battery on an officer, which led him to be incarcerated at the CCDC. *See State v. Specht*, Comanche County Case No. CF-2021-701. In July of 2022, while incarcerated at the CCDC, the Oklahoma Department of Mental Health and Substance Abuse Services ("ODMHSAS") arranged for Taylor to be transferred to the VA Hospital in Oklahoma City for inpatient mental health treatment, where he remained for approximately three (3) weeks.

13. The CCDC, including its staff and administration, were aware of Taylor's mental health diagnoses and struggles due to his incarceration in 2021 and 2022.

14. In June 2023, Taylor was arrested for an alleged bond violation and taken to the CCDC. On August 3, 2023, while still incarcerated at the CCDC, Taylor was ordered to "be examined by a qualified forensic evaluator with the intent to determine if [Taylor] suffers from a mental illness pursuant to Title 43A of the Oklahoma Statutes." *See State v. Specht*, Comanche County Case Nos. CF-2021-701 and CM-22-377. On August 14, 2023, the Court entered an "Order for Emergency Commitment," sending Taylor "to the Department of Mental Health and Substance Abuse Services for Care and Treatment." *Id.*

15. Due to Taylor having been incarcerated at the CCDC at that time, the CCFA/CCDC would have been on notice of Taylor's serious mental health needs.



**Exhibit 2**

16. On January 10, 2024, Taylor was arrested pursuant to a bench warrant and booked into the CCDC.

17. Upon information and belief, CCDC staff failed to conduct a complete or timely medical intake examination and therefore failed to ensure that Taylor was medically and/or mentally suited for admission at the CCDC.

18. Upon information and belief, Taylor was initially housed in a cell near booking with several other inmates due to a lack of available space at the facility.

19. Taylor called Plaintiff on several occasions in his first few days at the CCDC, and it was clear that he was not in the right state of mind.

20. On or around January 14, 2024, Plaintiff received a call from a CCDC employee, advising that Taylor had gotten upset while in booking and attempted to flood his cell. The employee noted that Taylor was "in bad shape."

21. As a result of the incident, Taylor was placed in a segregation cell/special housing cell, where he would remain until his March 6, 2024 death.

22. Upon information and belief, while in the segregation cell/special housing cell, Taylor was single-celled, unable to make phone calls, forced to remain in his cell nearly twenty-four hours a day, and was not provided laundry services, clean and adequate bedding, or regular showers.

23. Moreover, despite Taylor's obvious and apparent serious mental health needs, he was not provided with mental health care while in the segregation cell/special housing cell.

24. The combination of being isolated from the outside world, denied basic necessities, and the lack of mental health care attention, caused Taylor's mental state to decline even further.



**Exhibit 2**

... ...and January 30, 2024, Plaintiff called the CCDC to check on Taylor. ...the Plaintiff requested that Taylor be provided mental health care attention. the CCDC employee she was speaking with stated: "we don't do mental health. you will need to ... Taliaferro." Plaintiff further advised of Taylor's need for assorted prescription medication.

26. Upon information and belief. Taylor never received the mental health care he so desperately needed and instead was left alone in the segregation cell/special housing cell to fend for himself.

27. During this time, CCDC staff failed to regularly monitor or check on Taylor, despite knowledge of Taylor's fragile mental health condition.

28. Taylor's mental health deteriorated to the point that it was blatantly obvious that he was a serious risk to himself.

29. Plaintiff alleges that the lack of supervision was due in part to the overcrowding of inmates and the lack of staff at the CCDC.

30. At approximately 5:15 P.M. on March 6, 2024, Taylor was discovered hanging lifeless from a towel in his cell.

31. Upon information and belief, Taylor had not been observed by CCDC staff for an extended period of time prior to discovering Taylor dead in his cell.

32. The Oklahoma Medical Examiner determined Taylor's cause of death to be "hanging."[2]

- ***The CCDC's Lack of Supervision and Deficient Medical Delivery System***

---

2 The Medical Examiner's Report notes that Taylor had "a history of suicidal ideation and multiple inpatient hospitalizations for mental health concerns."

33. County entities may be held liable for the maintenance of an unconstitutional health care delivery system. In *Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019), the Tenth Circuit upheld a jury verdict against the Tulsa County Sheriff for his failure to supervise based on evidence that he maintained a policy or custom of insufficient medical resources and training, chronic delays in care and indifference toward medical needs at the Tulsa County Jail. *See Burke*, 935 F.3d at 999-1001.[3]

34. Here, there is an affirmative link to Taylor's untimely, and policies, practices, and customs promulgated by the Defendants. In particular, there were a number of deficiencies in the CCDC's policies, practices, and customs related to the screening, supervision, and care of inmates with serious mental health needs and exhibiting signs and symptoms of suicide.

35. These policies include:

a. Admitting persons to the CCDC without providing an adequate medical screening;

b. Unnecessarily keeping inmates with serious mental health issues in segregation cells;

c. Failing to properly monitor inmates in segregation cells as required by Oklahoma law;

d. Failing to adequately assess inmates with complex and serious mental health needs;

e. Failing to provide inmates with regular access to mental health care treatment; and

f. Failing to train staff on what constitutes alarming mental health symptoms, when to report alarming mental health signs to a physician, and failing to send inmates

---

3 *See also v. Crowson v. Washington Cty. Utah*, 983 F.3d 1166, 1192 (10th Cir. 2020) (finding that a county may face liability based on "theory [of] systemic failure of medical policies and procedures"); *Burke v. Glanz*, No. 11-CV-720-JED-PJC, 2016 WL 3951364, at *23 (N.D. Okla. July 20, 2016) ("[B]ased on the record evidence construed in plaintiff's favor, a reasonable jury could find that, in the years prior to Mr. Williams's death in 2011, then-Sheriff Glanz was responsible for knowingly continuing the operation of a policy or established practice of providing constitutionally deficient medical care in deliberate indifference to the serious medical needs of Jail inmates like Mr. Williams.").

with complex and serious mental health needs to an outside medical facility for an adequate assessment and treatment.

36. These issues stem largely from the Jail being overpopulated with inmates and understaffed with detention officers.[4] As a result of these issues, inmates were regularly denied necessary medical and mental health care, appropriate supervision, and adequate housing.

37. The issues inherent in the CCDC's operation are chronic and had been repeatedly identified in the years prior to Taylor's death in inspections performed by the Oklahoma Department of Health ("OSDH").

38. Operation of the CCDC is governed by Oklahoma state law and the OSDH's Jail Standards (herein after referred to as "Jail Standards"), which Oklahoma jails must meet to continue lawfully operating.

39. Oklahoma law provides that the OSDH is to "inspect at least once each year all detention facilities to ensure compliance with the standards set forth in the Oklahoma Jail Standards Act." 74 O.S. §192(C).

40. In the years prior to Taylor's death, the OSDH consistently substantiated deficiencies at the CCDC, which the Defendants were on notice of. For instance:

a. In a May 2020 interview, an OSDH spokesman explained that inspection reports from the prior five years found that the CCDC had "repeated deficiencies for being over-capacity."[5]

b. In a September 22, 2021 inspection, the OSDH found that the CCDC was over its rated inmate capacity of 283 and that due to an apparent lack of space, several "inmates being housed in day rooms of several pods," where they were "sleeping on a mat in a plastic boat." Most notably, the inspection report noted that a

---

4 Records from a CCFA Board Meeting indicates that on March 4, 2024, just two (2) days before Taylor's death, the CCDC was incarcerating 396 inmates, well over its rated limit of 283.

5 *See, Comanche County Detention Center cited numerous times for overcrowding*, Southwest Ledger, https://www.southwestledger.news/news/comanche-county-detention-center-cited-numerous-times-overcrowding



Exhibit 2

"[r]eview of the suicide watch logs revealed site checks are not being documented ever[y] fifteen minutes or on an hourly basis."

c. In a September 15, 2022 inspection, which was initiated following an inmate death, the OSDH found that the CCDC was again over the rated capacity of 283 by having 311 inmates and that staff had failed to conduct or document 34 required sight checks in connection with the death. The report further noted that "the facility failed to frequently observe an inmate whose screening indicated a significant suicide risk." Shockingly, a review of the relevant logs "for the dates of 7-30-2022 through 8-1-2022, revealed staff failed to conduct one hundred and sixty-five (165), 15 minute suicide precaution 'Sight Checks.'"

d. In a February 22, 2023 inspection, the OSDH found that the CCDC failed to document medical reception information in an acceptable format approved by the designated medical authority; use a medical questionnaire approved by the designated medical authority; and did not have a contracted physician.

e. In a June 20, 2023 inspection, the OSDH found that the CCDC was well over the rated capacity of 283 by having 369 inmates, failed to render or conduct hourly sight checks, timely notify the OSDH of two detainee deaths, observe detainees whose screening indicated a significant medial problem or suicide risk, document current illnesses and health problems, including medications taken and any special health requirements; and provide bedding due to numerous detainees sleeping on the floor without beds.

f. In August 23 and 30, 2023 inspections, the OSDH found that the CCDC failed to render hourly sight checks or keep adequate sight check logs; have a properly functioning intercom/communication system capable of providing an emergency response; and document medical reception information, current illnesses and health problems, including medications taken, and any special health requirements.

41. Perhaps most notable is the OSDH's May 14, 2024 thirty-one-page Inspection, which includes the following finding:

> Review of logs dated 03/06/24 12:00 a.m. to 03/07/24, 12:00 a.m., revealed thirty (30) minute sight checks for inmates being housed in locked down status (Pods 229, 241 and 314), were not documented every thirty (30) minutes as required by Comanche County Detention Center Policy and Procedure Security and Control Inmate Accountability. It was also observed the term "CCTV site check used or camera check. Staff must physically observe each inmate during a sight check.



Exhibit 2

42. The May 14, 2024 inspection further found several deficiencies related to the "Special Housing Unit," including that inmates were not provided with a change of clothes, a change of their bedding and towels, or showers.

43. There is an affirmative link between the aforementioned unconstitutional acts and/or omissions CCDC staff and policies, practices and/or customs which the Defendants promulgated, created, implemented and/or possessed responsibility for.

44. It was obvious that Taylor's mental health conditions could not be effectively treated in a correctional setting. Yet, despite the obvious and excessive risks to his health and safety, CCDC staff, refused to send him to the hospital or other facility with a higher level of care.

45. To the extent that no single officer or professional violated Taylor's constitutional rights, the CCFA is still liable under a theory of a systemic failure of policies and procedures as described below. There were such gross deficiencies in medical procedures, staffing and facilities and procedures that Taylor was effectively denied constitutional conditions of confinement.

## CAUSES OF ACTION

### CLAIM I. VIOLATION OF THE FOURTEENTH AND/OR EIGHTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES (42 U.S.C. §1983)

46. Paragraphs 1 through 45 are incorporated herein by reference.

**A. Underlying Constitutional Violations**

- ***Conditions of Confinement***

47. At the time of the complained of events, Taylor had a clearly established right under the Fourteenth and/or Eighth Amendments of the United States to adequate conditions of confinement.[6]

---

6 *See, e.g.*, *McBride v. Deer*, 240 F.3d 1287, 1291 (10th Cir. 2001) ("jail officials must 'provide humane conditions of confinement by ensuring inmates receive the basic necessities of

48. Any reasonable Jail employee knew or should have known those rights at the time of the complained of conduct as they were clearly established.

49. During the period of time that Taylor was housed in the Segregation Cell, he was not provided with clean clothes, bedding, or a shower.[7]

50. In violation of Taylor's rights under the Eighth and Fourteenth Amendments, CCDC staff failed to provide humane conditions of confinement by ensuring that Taylor received the basic necessities of adequate shelter, sleep, and personal hygiene.

51. These conditions resulted in unquestioned and serious deprivations of basic human needs and posed a substantial risk of serious harm to Taylor's health and safety.

52. CCDC staff knew of the excessive risks to Taylor's health and safety.

53. Indeed, the risk was so obvious that no reasonable correctional officer or nurse could have concluded that it was constitutionally permissible to house Taylor in such deplorably dangerous and unsanitary conditions for an extended period.

54. Despite their knowledge of these serious deprivations of Taylor's basic human needs and the substantial risk of serious harm these deprivations posed to Taylor's health and safety, CCDC staff disregarded these risks.

55. As a direct proximate result of the unlawful conduct of CCDC staff, Taylor suffered actual and severe physical injuries, physical pain and suffering, emotional and mental distress, loss of familial relationships, and death.

- ***Failure to Provide Medical Care***

---

adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety.") (citing *Craig v. Eberly,* 164 F.3d 490, 495 (10th Cir. 1998)).

[7] *See*, *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980) ("a state must provide within such living space reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (i.e., hot and cold water, light, heat, plumbing).").

56. Under the Fourteenth Amendment, Taylor had a constitutional right to receive medical care for his serious medical needs, which includes the provision of mental health care for his serious mental health needs.[8]

57. As described *supra*, Taylor had serious and emergent medical and mental health conditions that were known and obvious to the Turn Key/CCSO employees/agents prior to his death.

58. CCDC staff were aware of Taylor's mental health needs based on his prior incarcerations, his obvious presentation, and Plaintiff's phone calls requesting mental health care treatment.

59. Despite this knowledge, CCDC staff failed to provide or offer Taylor treatment or care for Taylor's serious mental health needs, disregarding the known and obvious risks to his health and safety.

60. In deliberate indifference to his serious medical needs, health, and safety, CCDC staff failed to provide Taylor with, *inter alia*, timely or adequate mental health treatment; proper monitoring and supervision; or reasonable access to outside medical providers who were qualified and capable of evaluating and treating him while he was placed under their care.

61. Furthermore, CCDC staff were aware that Taylor was at a serious risk of personal harm and would attempt to harm himself. CCDC staff were aware that Taylor was at a serious risk of self-harm.

---

8 *See, e.g., Parker v. City of Lawton, Oklahoma*, No. CIV-24-178-JD, 2024 WL 6815749, at *2 (W.D. Okla. Sept. 26, 2024) ("The right to custodial medical care is well settled.") (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)); *Templeton v. Anderson*, 607 F. App'x 784, 788 (10th Cir. 2015) ("The denial of mental health care can constitute deliberate indifference.") (citing *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir. 1980)).



**Exhibit 2**

62. CCDC staff were deliberately indifferent to Taylor's serious mental health needs by failing to monitor or supervise him, and by failing to intervene to prevent his, despite knowledge of the risk of self-harm.

63. As a direct proximate result of CCDC staff's unlawful conduct, Taylor suffered actual and severe physical injuries, physical pain and suffering, emotional and mental distress, and death.

**B. Municipal Liability (As to the CCFA)**

64. There is an affirmative causal link between the aforementioned acts and/or omissions of CCDC staff, as described above, in being deliberately indifferent to Taylor's serious medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by CCFA.

65. These customs, policies, and/or practices are summarized, inter alia, in paragraphs 33-45, *supra*.

66. The CCFA has maintained a healthcare delivery system that has "such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County*, 768 F.2d 303, 308 (10th Cir. 1985).

67. The CCFA maintained a policy or custom of insufficient medical staffing, resources and training, chronic delays and indifference toward medical needs of detainees and inmates. *See, e.g., Burke v. Regalado*, 935 F.3d 960, 999-1001 (10th Cir. 2019).

68. The patently deficient medical delivery system, as designed by the CCFA, resulted in a "systemic failure of medical policies and procedures." *Crowson v. Washington Cty. Utah*, 983 F.3d 1166, 1192 (10th Cir. 2020).

69. To the extent that no single officer or professional violated Ms. Hanchett's constitutional rights, Turn Key is still liable under a theory of a systemic failure of policies and procedures as described herein. Again, there were such gross deficiencies in medical procedures, staffing and facilities and procedures that Ms. Hanchett was effectively denied constitutional conditions of confinement.

70. The CCFA knew, must have known or should have known that, by maintaining such customs, practices, and/or policies, detainees like Taylor were at substantial risk of harm. Nevertheless, the CCFA failed to take reasonable measures to alleviate the risk of harm.

71. The CCFA, through its failure to take reasonable remediable measures has been deliberately indifferent to citizens', including Taylor's, health and safety.

72. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Taylor suffered actual and severe physical injuries, physical pain and suffering, emotional and mental distress, and death.

**C. Supervisory Liability (As to Defendant Hobbs)**

73. Defendant Hobbs served as Administrator of the CCDC at all times relevant herein, and had supervisory authority over policies, staffing, training, inmate mental health care, and inmate supervision.

74. As Administrator, Defendant Hobbs was responsible for maintaining and implementing the deficient customs, policies, and/or practices referenced in paragraphs 33-45, *supra*.

75. In deliberate indifference, Defendant Hobbs permitted chronic staffing and operational deficiencies to persist—including deficiencies reflected in OSDH findings and similar

oversight materials related to medical screening, inmate supervision, and suicide checks—deficiencies that created a predictable risk of exactly the harms suffered by Taylor.

76. Defendant Hobbs knew, must have known or should have known that, by maintaining such customs, practices, and/or policies, detainees like Taylor were at substantial risk of harm. Nevertheless, Defendant Hobbs failed to take reasonable measures to alleviate the risk of harm

77. As a direct and proximate result of Defendant Hobbs' creation and implementation of the aforementioned customs, policies, and/or practices, Taylor suffered actual and severe physical injuries, physical pain and suffering, emotional and mental distress, and death.

78. Defendant Hobbs' conduct, which caused the damages referenced herein, showed complete indifference to and/or conscious disregard for the health and safety of Taylor and others, justifying the imposition of punitive damages.

**CLAIM II. NEGLIGENCE/WRONGFUL DEATH**
**(*As to the CCFA*)**

79. Paragraphs 1 through 78 are incorporated herein by reference.

80. The CCFA/CCDC owed a duty to Derek, and all other inmates at the Jail, to provide adequate medical and/or mental health care or otherwise ensure the availability of the same.

81. The CCFA/CCDC, through its employees and agents, breached that duty by wholly failing to provide Taylor with prompt and adequate mental health treatment despite the obvious need.

82. The CCFA/CCDC and their employees' breaches of the duty of care include, inter alia: a failure to conduct appropriate medical assessments; failure to create and implement appropriate medical treatment plans; failure to promptly evaluate Taylor's mental health needs; failure to properly monitor Taylor's mental condition; failure to provide access to medical



**Exhibit 2**

personnel capable of evaluating and treating Derek's serious mental health needs; and a failure to take precautions to prevent Derek from further injury.

83. The CCFA/CCDC employees were acting within the scope of their employment at all times relevant herein and, thus, the CCFA/CCDC are vicariously liable for their actions.

84. Furthermore, because the CCFA/CCDC is a public trust with a county as its sole beneficiary that operates a facility which houses federal inmates or inmates from another state, the immunity otherwise provided by the Oklahoma Governmental Tort Claims Act ("GTCA") does not apply.[9]

85. As a direct and proximate cause of the CCFA/CCDC, and its employee's negligence, Taylor experienced physical pain, severe emotional distress, mental anguish, death, and the other damages alleged herein.

**WHEREFORE,** based on the foregoing, Plaintiff prays that this Court grant the relief sought including but not limited to actual and compensatory damages, and punitive damages, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

---

9 *See*, 51 O.S. § 153.1 ("If a public trust that has as its sole beneficiary a city, town or county has a facility that houses federal inmates or inmates from another state, the immunity provided for in the Governmental Tort Claims Act shall not apply to that trust.")

Respectfully submitted,

**SMOLEN | LAW, PLLC**

Donald E. Smolen, II, OBA#19944
Jack Warren, *OBA #33635*
611 S. Detroit Ave.
Tulsa, OK 74120
P: (918) 777-4LAW (4529)
F: (918) 890-4529
don@smolen.law
jack@smolen.law
*Attorneys for Plaintiff*



**Exhibit 2**